400 P.2d 115

**CITY OF PHOENIX, a Municipal Corporation, Appellant and Cross Appellee,**

**and**

**Clay Millwee, Cross Appellee,**

**v.**

**Gilbert J. CAMFIELD, Appellee and Cross Appellant.**

**No. 7861.**

Supreme Court of Arizona.

En Banc.

March 11, 1965.

Merle L. Hanson, City Atty., James D. Lester, Asst. City Atty., for City of Phoenix.

Kramer, Roche, Burch & Streich, Phoenix, for cross appellee, Clay Millwee.

Laney & Laney, Phoenix, for appellee and cross appellant.

BERNSTEIN, Justice.

Appellant, City of Phoenix, was co-defendant in a suit which arose out of injuries

sustained when a city police car on a chase went out of control, crashed through a house, and ran over the plaintiff as he was lying in bed. The other defendant was the police officer. The trial judge directed a verdict in favor of the police officer on the ground that the evidence did not show he had acted with reckless disregard of the safety of others and in favor of the City of Phoenix to the extent that the defense of governmental immunity applied to the case.

The City's motion for a directed verdict on the issue of negligent maintenance of its streets was denied and a verdict and judgment for $150,000 was entered on this count. The City of Phoenix has appealed from the judgment against it and the plaintiff has appealed from the directed verdict in favor of the police officer and from the directed verdict in favor of the City on its claim of liability based on respondeat superior. In view of our decision affirming the judgment herein we do not reach the questions raised by the cross appeal as they were specifically abandoned by cross appellant.

The cross appellant said in his brief:

"* * * we * * * insist upon the assignments of error upon which our cross-appeal is predicated, if, but only if, the Supreme Court should reverse Camfield's monetary judgment against the City of Phoenix or in any manner

bring about the necessity of our trying again his claim for damages."

On October 15, 1961 Police Sergeant Millwee of the City of Phoenix was on patrol duty in a 1960 Plymouth Station Wagon police vehicle. He saw two boys park their car and start into a bar. As he headed toward the bar the boys saw him, jumped back in their car and fled. Sergeant Millwee made a U turn and gave chase. During the chase the speed of the two vehicles was as high as 70 to 80 miles per hour, and the boys committed a number of traffic violations. The police car went out of control at the intersection of 7th Street and East Buckeye Road in Phoenix. The cars were going South on 7th Street at the time. There are two dips for drainage, one on each side of the intersection. The dips were approximately one foot deep. Sergeant Millwee testified that he knew of these dips, knew them to be dangerous, and went through the intersection at an angle on the left side of the road at 50 miles per hour. The evidence further showed that as he went over the dips his police car bounced severely causing it to hit the pavement and "bottom out" shearing off part of the undercarriage and breaking the steering mechanism of the car. Sergeant Millwee attempted to bring his car over to the right side of the road but it veered to the left. As soon as he found his car was out of control Sergeant Millwee stepped on the brakes but was unable to stop the car before it crashed

through the house. The plaintiff was permanently paralyzed from the chest down.

Sergeant Millwee further testified he had crossed the intersection a great number of times prior to the accident and on one occasion during a chase his undercarriage had also hit the pavement, although his car did not go out of control. The posted speed limit at the intersection is 35 miles per hour.

Sergeant Millwee also testified that his wheels bounced when he crossed the intersection at the posted speed limit. A witness who had run a filling station at a corner of the intersection testified that he had observed many cars cross the intersection and further testified:

"Mr. LANEY: Q What did you observe about these cars, we will say when they were going thirty miles per hour crossing those dips?

"A Well, you mean just a kind of explanation?

"Q What did you observe happen to them, if anything?

"A They bounce badly at thirty miles an hour, very badly at thirty-five miles an hour.

"Q What about at twenty-five miles an hour?

"A Well, even at twenty-five, yes.

"Q And when you say they bounce badly at thirty miles an hour, will you tell the Court how high they would get, if at all, off the ground?

"A Well, actually off the ground at thirty miles an hour, they just— they kind of come up and then straight across the top of the intersection, then as they come down off the other side, the back end comes down, and the front end—practically no weight on the front wheels, if any, when they come off the other side of the intersection."

He also testified that he himself slowed to fifteen miles per hour when crossing the intersection and said:

"Q I see; and what effect, if any, have you seen that bouncing had on traffic there, from day to day?

"A Well, the trunk lids come open and tires fall off, underneath of pickups, and out of the back of cars, if that is what you mean."

The witness described a 1960 Plymouth Station Wagon which crossed the intersection at 35 miles per hour as landing "just kind of like a small airplane when it comes down."

Another witness testified that when the intersection was negotiated at 35 miles per hour:

"A Well, you would bounce all over your seat, if you were sitting, say people sitting in the back seat,

they would bounce from one side to the other of the seat of the car; and also have saw fruit trucks go across there with fruit boxes."

\*    \*    \*    \*    \*    \*

"MR. LANEY: I will ask you if you have observed trucks going across there, have you observed trucks going across that intersection going north or *south*?

"A  Yes, Sir, I have saw fruit trucks haul grapefruit in the boxes, and I have seen *the grapefruit bounce* from the trucks and also watermelons drop from the trucks, these produce trucks."

A series of tests which were run by an expert for the City showed that at 50 miles per hour the bounce of the car was quite severe, but in none of the tests did the undercarriage hit the pavement nor did the cars used in the test go out of control.

Appellant, City of Phoenix, contends that its motion for a directed verdict should have been granted as there was no evidence from which reasonable men could find that it violated its duty in the maintenance of an intersection "reasonably safe for lawful travel with ordinary care and caution"; the actions of Sergeant Millwee were the sole proximate cause of the injury; the condition of the street was not the proximate cause of the injury; evidence was improperly refused, and that the court improperly refused to charge the jury that they could find that the injuries resulted from an unavoidable accident.

Notice to the City of Phoenix of the hazardous condition has not been made an issue in this case.

This court in ruling upon the liability of a municipality for maintenance of its streets said:

"(1) A municipality vested with power to improve and control its streets and sidewalks is liable for injuries sustained because of a failure to keep them reasonably safe for travel.

"(2) *No hard and fast rule can be laid down in such cases as to the character or extent of the defect in the street or sidewalk necessary to form the basis for actionable negligence, but each case must stand upon its own particular facts.*"  City of Phoenix v. Weedon, 71 Ariz. 259, 263–264, 226 P.2d 157, 160. (Emphasis supplied.)

The duty imposed on the City in the maintenance of its streets has been stated as follows:

"The requirements for recovery against a municipality for injury from a highway defect \* \* \* are commonly as follows:

"1.  A condition of the highway which renders it unreasonably safe for ordi-

nary travel, or for such other proper use \* \* \* as is reasonable to be anticipated." 2 Harper and James, The Law of Torts, 29.7 p. 1629.

▮ Whether the condition is a defect is a question for the jury. City of Phoenix v. Weedon, supra. The condition of the street was such that reasonable men could arrive at different conclusions as to whether the intersection was unsafe and we are unable to say the jury was wrong in so finding.

▮ The City next contends that the actions of Sergeant Millwee were the sole proximate cause of the injuries in that he went through the intersection at 50 miles per hour with knowledge that the condition of the intersection was potentially dangerous and it was more dangerous as the speed increased. As the jury was justified in finding the intersection defective at speeds up to the speed limit the question is whether the City could reasonably have foreseen that an emergency vehicle would go through the intersection at a speed in excess of the posted speed limit. Again the question of foreseeability is generally one of fact to be left to the jury. Here the testimony is that emergency vehicles had gone through this particular intersection at speeds in excess of the speed at which Sergeant Millwee's vehicle was traveling. Under these circumstances a jury could find that the City could have foreseen that

emergency vehicles would go through the intersection at such speeds.

As this court said in Beltran v. Stroud, 63 Ariz. 249, 254, 160 P.2d 765, 767:

"There may be more than one proximate cause of an accident if each was an efficient one without which the injuries resulting would not have occurred. Sweet v. Perkins [196 N.Y. 482, 90 N.E. 50], supra. If the obstruction to the street or highway was unreasonable and required the deceased to walk in a dangerous place, and he was injured as alleged, the obstruction may be found to be one of the proximate causes. It is true, from the allegations of the complaint, that he was injured by an intervening cause, but if that cause is of a nature which could reasonably have been anticipated, the earlier negligent act—the obstruction to the highway—if it contributed to the accident may also be regarded as the proximate or concurring cause. Garibaldi [& Cuneo] v. O'Connor [210 Ill. 284, 71 N.E. 379, 66 L.R.A. 73], supra. The question would appear to be one for the jury."

The City further contends that the officer's conduct as herein described was an independent intervening cause of the accident, thus relieving the City of its liability. The City relies on Hillyard v. Utah By-Products Co., 1 Utah 2d 143, 151, 263 P.

2d 287, 292, which relies in part on Salt River Valley Water Users' Ass'n v. Cornum, 49 Ariz. 1, 63 P.2d 639. The Utah court said:

"In applying the test of foreseeability to situations where a negligently created pre-existing condition combines with a later act of negligence causing an injury, the courts have drawn a clear-cut distinction between two classes of cases. The first situation is where one has negligently created a dangerous condition [such as parking the truck] and a later actor observed, or circumstances are such that he could not fail to observe, but negligently failed to avoid it. The second situation involves conduct of a later intervening actor who negligently failed to observe the dangerous condition until it is *too late* to avoid it. In regard to the first situation it is held as a matter of law that the later intervening act does interrupt the natural sequence of events and cut off the legal effect of the negligence of the initial actor. This is based upon the reasoning that it is not reasonably to be foreseen nor expected that one who *actually* becomes cognizant of a dangerous condition in ample time to avert injury will fail to do so." (Emphasis in original.)

[4,5] What the City overlooks is that the alleged intervening cause was the action of an employee of the City. One cannot be heard to complain that his own act operating on his own negligence is an intervening cause. Webber v. E. K. Larimer Hardware Co., 234 Iowa 1381, 1382, 15 N.W.2d 286. And where the illegal and intervening act was committed by an employee of the defendant it is the same as if it had been committed by the defendant himself.

In addition, Salt River Valley Water Users' Ass'n, supra, involved a fact situation where the court held that it was not foreseeable that the negligence would be a cause of the accident. We have already held that the City could have foreseen that emergency police vehicles would go through the intersection at a speed greater than the speed limit and where the intervening cause is a foreseeable one the original party is not absolved of liability for his negligence. Webber, supra.

The City next contends that the trial court erred in refusing testimony by an expert called by the City to the effect that the intersection was safe or dangerous at 35 miles per hour. The expert had run three series of tests of automobiles crossing the intersection at various speeds. He had taken motion pictures of the automobiles at the time of the last two tests. The expert testified at length as to the effect of the condition of the intersection upon the automobiles. The jury was shown 180 feet of movie film depicting the last two tests.

The question to which an objection was sustained was:

"Q Now, Mr. Haley, do you have any opinion with regard to the safety or danger of that intersection and those dips in the intersection at 35 miles per hour?"

We have here the precise situation described in Alires v. Southern Pacific Company, 93 Ariz. 97, 108, 378 P.2d 913, 920. Where we said:

"The principle to be applied is that where the facts can be intelligently described to the jurors and understood by them and they can form a reasonable opinion for themselves, the opinion of experts will be rejected."

■■ Opinion evidence is admitted primarily on the basis of necessity or when it is likely to aid the jury. But when the facts are described or detailed as they have been in this case the jury can draw proper conclusions therefrom and the need for an expert opinion does not exist. We find no error in refusing the opinion evidence of the expert under these conditions.

The City next contends the trial judge erred in refusing to give an instruction on "unavoidable accident". This court has heretofore limited the application of the principle of unavoidable accident in Gray v. Woods, 84 Ariz. 87, 94, 324 P.2d 220, 224:

"We find no evidence in this case tending to show that the death of Paul Gray resulted from any cause other than negligence on the part of someone; *and where the accident could not have happened without negligence or contributory negligence it is not an unavoidable accident.*" (Emphasis supplied.)

See also Mitchel v. Colquette, 93 Ariz. 211, 379 P.2d 757. In cases in which we have held it not to be reversible error to give an instruction on unavoidable accident, the rationale has been that the evidence showed the accident happened without negligence. Beliak v. Plants, 93 Ariz. 266, 379 P.2d 976. The modern trend seems to be away from the giving of such an instruction. If the jury is properly instructed on the necessity of negligence on the part of the defendant and the request that this negligence be the proximate cause of the injury that is sufficient. The defense of unavoidable accident is actually a defense of non negligence and an instruction on unavoidable accident is, in fact, confusing. It improperly implies that "unavoidable accident" is a separate and distinct defense from "non negligence."

"The rules concerning negligence and proximate causation which must be explained to the jury are in themselves complicated and difficult to understand. The further complication resulting from the unnecessary concept of unavoidability or inevitability and its problematic relation to negligence and

proximate cause can lead only to misunderstanding." Butigan v. Yellow Cab Co., 49 Cal.2d 652, 660, 320 P.2d 500, 505, 65 A.L.R.2d 1.

And in Fenton v. Aleshire (Or.1964), 393 P.2d 217, 222, the Oregon court in overruling their previous decisions said:

> "In the modern law of negligence the doctrine of 'unavoidable accident,' or, as it is sometimes called 'inevitable' or 'pure' accident, is an anomaly. By definition—at least by the definition adopted by this court—it has no place as a separate and independent element in an action based on negligence. As pointed out by Paul G. Rees, Jr., of the Arizona Bar, in a scholarly article entitled 'Unavoidable Accident—A Misunderstood Concept', 'the Restatement of Torts does not treat unavoidable accident as an entity of the law.' 5 Ariz. Law Rev. 225, footnote 11, at 228."

In California although the instruction is error the question of whether the giving of the instruction is reversible depends on whether the error is prejudicial. Butigan v. Yellow Cab, supra; Pobor v. Western Pacific Railroad Company, 55 Cal.2d 314, 11 Cal.Rptr. 106, 359 P.2d 474. Oregon takes the same position:

> "This reasoning * * * makes unavoidable the conclusion that instructions on unavoidable accidents in negligence cases are without value and may be prejudicial." Fenton v. Aleshire, supra, 393 P.2d at 223.

Article 6, sec. 27 of the Arizona Constitution, A.R.S. provides:

> " * * * No cause shall be reversed for technical error * * * when upon the whole case it shall appear that substantial justice has been done."

See also Noel v. Ostlie, 42 Ariz. 113, 22 P.2d 831. In view of this constitutional article we hold that while it is always error to give an instruction on unavoidable accident, a plaintiff must show prejudice in the giving of such an instruction. But we also hold that it can never be error to refuse to give the instruction on "unavoidable accident" and that the instruction should not be given in the ordinary case, Fenton v. Aleshire, supra.

The City complains of the giving and the refusal to give certain instructions. The City fails to point out, except as they generally argue the case in their briefs, wherein the trial court erred. We have discussed the problems raised by these assignments in the body of this opinion and find them to be without merit.

Affirmed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and McFARLAND, JJ.; concurring.